IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| United States of America,<br><br>v.<br><br>Jesus Alfredo Salazar-Ramirez. | EP-06-CR-1027-LS-4<br><br>EP-24-CR-2707-LS<br>(12-CR-237 (DDC)) |

**Sentencing Memorandum**

Jesus Alfredo Salazar Ramirez (hereinafter "Alfredo"), through undersigned counsel, respectfully submits the following memorandum in preparation for his sentencing scheduled for Monday, July 28, 2025. The Defense respectfully requests the Court adopt the parties' plea agreement and apply a downward variance, though at this time, the Defense defers to the sound discretion of the Court in determining the exact sentence. This request is based on the following factors relevant to 18 U.S.C. § 3553: lack of youthful guidance and age when the offense began, semi-duress related to safety threats against Alfredo's family, and current age and unlikelihood of recidivism.

## 1. HISTORIC FORCES THAT SHAPED ALFREDO'S CHARACTER.

Alfredo Salazar was born in 1972 and raised in Navojoa, Sonora, as well as the surrounding highlands.[1] Navojoa is situated in the Mayo Valley, known as one of the most productive agricultural regions in Mexico. The region focuses on grains (like garbanzos) and cattle products (like hides), for two reasons. First, they require relatively little rainfall to produce. Second, they are export products. Due to distance and terrain

[1] His birthplace, Chinipas de Almada, Chihuahua, is a small rural community in the Sierra Madre Occidental. Today, it is about a 3.5 hour drive from Navojoa to Chinipas.

between Navojoa and Mexico City, agriculture in Navojoa has historically depended on export products to the United States. In fact, railroad lines connected Sonora to the United States well before they connected that region to the rest of Mexico.

Alfredo's father, Adan, worked for state agencies that supported agricultural efforts, specifically with a focus on eradicating parasites. Perhaps because of their location and his particular employment, Adan also became involved in the cultivation and trafficking of marijuana. Alfredo, however, had a rocky relationship with his father during his youth. Their personalities clashed and, at age 15 (1987), Alfredo left the home to try to fend for himself.

1987 was a particularly bad year to choose to head out on one's own. Already, Mexico had been experiencing economic decline and instability since 1969. From 1970 onward, Mexico experienced one crisis after another. The peso's value plummeted compared to other currencies like the dollar, and the nation then experienced a national debt emergency compounded by its substantial indebted to the United States, causing interest rates to rise. By 1982, "the real exchange rate fell by 50 percent . . . and inflation approached 100 percent." Mexico was forced to turn to the U.S., the International Monetary Fund, and bank creditors for bailouts, after which the federal government made the ill-advised decision to nationalize the banking system. In 1987—the same year Alfredo tried to go out on his own—Mexico's inflation rate hit 159% and the exchange rate fell by 139%. Richard Salvucci, "The Economic History of Mexico," EH.net Encyclopedia (August 8, 2025), *available at* http://eh.net/encyclopedia/the-economic-history-of-mexico/.

The present case might have never arisen had Alfredo stayed away from his father. It is not difficult, however, to imagine why cultural and economic dynamics would have

drawn a teenager in these circumstances back into his father's orbit. Any Mexican boy in the 1980s would have felt pressure to respect or idolize his father who, by all appearances, was economically successful. Moreover, even after running away, such a boy would have felt the desire to earn the reciprocal respect of his father.[2]

In short, Alfredo was introduced to trafficking at a young age and in that respect, his case would not be unique: our Nation's courts handle thousands of drug cases each year involving young men, most of whom follow a familiar pattern of irrational decision-making due to a lack of education, maturity, perspective, or economic opportunity.

Having returned to the orbit of his father, Alfredo and one of his seven siblings were sent to piloting school, approximately in 1990. Alfredo earned his private pilot's license in 1995 and his commercial pilot's license in 1997. In the interim, Mexico and the United States began implementing the North American Free Trade Agreement, which had a substantial effect on agricultural regions in Mexico, such as Navajoa. For example, farmers who had been dependent on grains like corn found that they could not compete with American producers, who had access to more sophisticated irrigation systems. In turn, the reliance on unlawful crops, such as marijuana, grew even stronger in the region.

Also during this time, Alfredo began his own family. But due to a tragedy that occurred at the start of this era of his life, Alfredo frequently feared for his family members and held a deep need to protect them. Specifically, Alfredo's first partner—who was seven-months pregnant at the time—died in a car crash that also left Alfredo

---

[2] This is a theme frequently seen in families whose patriarchs are involved in organized crime. *See* Michael Franzese, "Is the Cali Cartel in Colombia Still Active? Former Leader of Cali Cartel," YouTube, 5:42-7:42 (October 19, 2022) (Franzese—of the Cosa Nostra mafia—interviews William Rodriguez Abadia—former leader of Cali Cartel—discussing how, in their youth, they idolized their fathers who were successful drug traffickers and felt pressure to "honor our fathers"), *available at https://www.youtube.com/watch?v=bY7qRH58qB0*.

hospitalized. Alfredo had many more children after this tragedy, and as to each, he was keenly aware of the fragility of life—a theme that would surface throughout his life.

As stated in the indictments and plea agreement, Alfredo participated in a drug conspiracy starting in 1998, at which time he was 25 years old and his father was 54. The factual basis of the agreement also notes that conflict with other drug trafficking organizations began to grow in 2003 and 2004, when Alfredo was 32 years old. At that time, the Salazars turned to move powerful allies for protection and help. The existential threat to Alfredo's family was immediately evident. In 2005, his brother Abelardo was kidnapped and never seen again. Then, in 2007, his brother Alonzo was killed.

Alonzo's killing precipitated another violent episode referenced in the plea agreement and Presentence Investigation Report. [*See* Presentence Investigation Report ("PSI"), ¶ 41.] Following the murder—and unbeknownst to Alfredo—men working for Ismael Zambada Garcia ("El Mayo") kidnapped the individual who had killed Alonzo. Zambada's men then invited Alfredo to a ranch, where they presented the killer to Alfredo like some sort of trophy. Alfredo was disgusted by the entire series of events. He hit his brother's killer, but he refused to kill the man when given the chance. Nonetheless, after Alfredo left the scene, Zambada's men killed the man they had kidnapped.

The District of Columbia conspiracy ended with Alfredo's arrest by Mexican authorities on November 2, 2012. Despite his detention, the violence continued. In 2016, when Alfredo was 44 years old, his brother Adan Salazar Ramirez was killed. Approximately three years later, in 2019, one of his sons was killed.

**2. A DOWNWARD VARIANCE IS APPROPRIATE.**

Applying the factors described in 18 U.S.C. § 3553, and considering the history of characteristics of Alfredo, a downward variance is appropriate. In this case, the undeniable gravity of the offense is tempered by the history of Alfredo's life and the circumstances under which he engaged in the conduct. *See* § 3553(a)(1), (2)(A).

Although Alfredo reported that he was "reared in a stable home environment," [PSI, ¶ 59,] the reality is that his own father recruited him into the conduct leading to the present offense. To that extent, he "lacked youthful guidance" that could have instilled pro-social values. Similarly, the economic circumstances in Sonora at the time that Alfredo tried to leave his family—when he was only 15 years old—made it very unlikely that he could have found stability on his own. Instead, he was drawn back into the orbit of his father's enterprise.

If Alfredo lacked the maturity or wisdom to make a better choice as a teenager, the question then arises: why did he not leave later on in life? The answer lies at least in part in the logic of the Prisoners' Dilemma, a theory developed in game theory to illustrate why an individual would choose a suboptimal outcome due to a lack of security and trust in other actors. Simply put, quitting would not end in détente; instead, he and the rest of his family would be at risk of being killed by others. At least one scholarly study has found that, unlike terrorist organizations, removing leaders of drug trafficking organizations leads to *increased* violence. Brian J. Phillips, *How Does Leadership Decapitation Affect Violence? The Case of Drug Trafficking Organizations in Mexico*, 77 Journal of Politics 2 (April 2015).[3] The study's author hypothesizes that Mexican drug

[3] Counsel has purchased a copy of this study from the University of Chicago and will provide it directly to the Court and Government, so as to not publish it online without the author's consent.

trafficking organizations "cannot turn to the state for protection," leading them to create their own bubbles of safety. *Id.* at 2. But once a leader has been removed, the power vacuum that is created can lead to violence and instability as others fight for power. *Id.* at 3. In short, as one expert in the field has commented, "[q]uitting the group can result in deadly consequences for former members." Paul Rexton Kan, *El Chapo Bin Laden? Why Drug Cartels are not Terrorist Organizations*, International Centre for Counter-Terrorism (Feb. 4, 2020), *available at* https://icct.nl/publication/el-chapo-bin-laden-why-drug-cartels-are-not-terrorist-organisations.

Alfredo's life as an adult would have been defined by this logic and the need to protect his family. He had already lost his first partner to a tragic accident. Not long after joining his father's enterprise as a young man, he lost two more brothers to violence. Because of the lawless state of affairs, a rational person—and even a morally good person—could still reach the conclusion that it might better serve his family to continue in the same course of conduct—thereby generating his own safety—rather than abandoning the enterprise all together, which might have resulted in the slaughter of his entire family.[4] [*Cf. United States v. Willis*, 38 F.3d 170, 176 (5th Cir. 1994) (referencing imperfect duress pursuant to U.S.S.G. § 5K2.12 using subjective standard).]

Alfredo's detention was a blessing to some extent in that it ended this cycle. Of course, other members of his family were killed following his arrest. Nonetheless, since 2012, he has now been in detention and removed from the immediate forces that previously influenced his decisions. This also means that, when he re-enters society, he will be substantially older than when he started down the path leading to the current

[4] It is not difficult to find examples that demonstrate how likely this result would have been. *See* "LeBarón and Langford families massacre," *Wikipedia* (last viewed July 15, 2025), *available at https://en.wikipedia.org/wiki/LeBar%C3%B3n_and_Langford_families_massacre*.

cases. With that in mind, the statistical probability of recidivism has decreased substantially. *See* § 3553(a)(2)(D); *see United States v. Simmons*, 568 F.3d 564 (5th Cir. 2009); *see also* Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate, p. 12 (May 2004) ("Recidivism rates decline relatively consistently as age increases, from 35.5% under age 21 to 9.5% over age 50.").

In sum, the gravity of the offense at hand does not necessarily imply that Alfredo is morally corrupt. To the contrary, the external factors at play—where he was born, who his father was, the economic circumstances, lawlessness and violence, deaths, and the desire to care for his family—would certainly affect any rational man. In turn, because of the unique culmination of these factors, a downward variance is appropriate in this case.

## 3. CONCLUSION

For the foregoing reasons, the Defense respectfully requests the Court consider the above-described circumstances when considering the factors under § 3553 and, ultimately, apply a downward variance.

Respectfully submitted on August 8, 2025,

*/s/ Grant D. Wille*

GRANT D. WILLE
Attorney for Salazar-Ramirez

*Ralls & Wille, P.C.*
314 South 6th Avenue
Tucson, Arizona 85701
(520) 884-1234
(520) 884-9687 (fax)
grant@rallslawoffice.com
Arizona Bar No. 031989

CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2025, I electronically transmitted/hand delivered the attached document to the Clerks' Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing and/or delivered copies via electronic mail to the following CM/ECF registrants:

Andres.ortega@usdoj.gov

Steven.r.spitzer@usdoj.gov

Kirk.handrich@usdoj.gov

Jayce.born@usdoj.gov

*/s/ Grant D. Wille*
GRANT D. WILLE
Attorney for Salazar-Ramirez